Law Offices
**FLYNN, SHERIDAN & TABB**
P.O. Box 1668
6125 El Tordo
Rancho Santa Fe, California 92067
(619) 756-5823

PHILIP H. STILLMAN, Bar # 152861

(SPACE BELOW PROVIDED FOR FILING STAMP ONLY)

ORIGINAL

Attorneys for Plaintiff MICHAEL E. LOVE

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL E. LOVE, | CASE NO. 92-4594 WJR (Tx) |
| Plaintiff, | PLAINTIFF'S TRIAL BRIEF |
| vs. | |
| BRIAN D. WILSON, an individual, by and through Jerome S. Billet in his representative capacity as Conservator of the Person and Estate of Brian Wilson, | Date:  May 17, 1994 Time:  10 a.m. Court: Courtroom 10 |
| Defendants. | The Honorable William J. Rea |

1

**TABLE OF CONTENTS**

2

3  INTRODUCTORY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

4  SUMMARY OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

5      A.    The 1960's. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

6      B.    The 1980's. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

7      C.    1989 - 1992: The Wilson Litigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

8  SUMMARY OF CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

9  LEGAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

10     I.     THE EIGHTEEN AND NINETEENTH CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

11            A.    Promissory Estoppel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

12                  1.    The Promises Made To Mike Love. . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

13                  2.    Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

14            B.    Unjust Enrichment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

15            C.    Conspiracy To Defraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

16     II.    MR. LOVE'S BREACH OF CONTRACT CLAIM . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

17            A.    Mr. Love Will Prove Every Element Of A Contract . . . . . . . . . . . . . . . . . . .  13

18            B.    Wilson's "Defenses" Are Not Meritorious. . . . . . . . . . . . . . . . . . . . . . . . . .  15

19                  1.    The Promises Are Not "Uncertain." . . . . . . . . . . . . . . . . . . . . . . . . . .  16

20                  2.    The Conservator "Cancellation" Theory. . . . . . . . . . . . . . . . . . . . . . .  17

21     III.   MASON AND TIERNEY WERE WILSON'S AGENTS  WITH AUTHORITY TO BIND
22            WILSON . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

              A.    Mason And Tierney Had Actual Authority . . . . . . . . . . . . . . . . . . . . . . . . .  18
23
              B.    Mason And Tierney Had Apparent Or Ostensible Authority . . . . . . . . . . . .  19
24
                    1.    Wilson Directly Authorized The Tortious Conduct. . . . . . . . . . . . . .  21
25
                    2.    Wilson Ratified The Torts Of His Agents . . . . . . . . . . . . . . . . . . . . .  21
26
                    3.    Wilson Is Liable Under The Doctrine Of *Respondeat Superior* . . . . .  22
27
       IV.    EVIDENTIARY ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23
28

A.  Evidence Supporting Mr. Love's Dismissed Claims Is Still Relevant To The Remaining Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    1.  The 1960's Facts Are Relevant To Whether The Promises Were Made. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    2.  The 1960's Facts Are Relevant To Mr. Love's Justified Reliance. . . . 24

    3.  The 1960's Facts Are Relevant To Damages. . . . . . . . . . . . . . . . . . 25

    4.  The 1960's Facts Are Relevant To The Question Of Injustice In Not Enforcing The Promises. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

    5.  The 1960's Facts Are Relevant to Mr. Love's Contract Claims. . . . . . 25

    6.  The 1960's Facts Are Relevant to Mr. Love's Nineteenth Cause of Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

    7.  The 1960's Facts Are Relevant To The Eleventh Cause Of Action. . . 26

        a.  Relevancy To Whether The Misrepresentations Were Made . 27

        b.  The 1960's Facts Are Relevant To Wilson's Knowledge Of The Falsity Of His Representations . . . . . . . . . . . . . . . . . . . . . . . 28

        c.  The 1960's Facts Are Relevant To Mr. Love's Justified Reliance And His Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    8.  Such Evidence, If Excluded, Is Highly Prejudicial to Mr. Love . . . . . 29

B.  Relevance Of Certain 1980's Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    1.  The Relevance Of Wilson's Verified First Amended Complaint . . . . 29

    2.  The Relevance Of The 1986 Fee Agreements And Billing Records . . 30

    3.  The Relevance Of John Branca's Knowledge Of The Conflict Of Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

C.  Wilson Cannot Use Depositions From The Wilson Litigation In This Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

D.  Other Evidentiary Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

## TABLE OF AUTHORITIES

*Acme Printing Ink Co. v. Menard, Inc.*, 812 F.Supp. 1498 (E.D.Wisc. 1992) . . . . . . . . . . . . . . 32

*A-C Co. v. Security Pacific Nat. Bank*, 173 Cal.App.3d 462 (1985) . . . . . . . . . . . . . . . . . . . . 8, 13

*Boyd v. Bevilacqua*, 247 Cal.App.2d 272, 288 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Calistoga Civic Club v. Calistoga*, 143 Cal.App.3d 111, 116 (1983) . . . . . . . . . . . . . . . . . . . . 11

*Coldwell Banker & Co. v. Pepper Tree Office Associates*,
106 Cal.App.3d 272, 280 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Gladstone v. Hillel*,  203 Cal.App.3d 977, 988 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Julian v. Gold*, 214 Cal. 74, 76 (1931) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Krobitzsch v. Middleton*, 72 Cal.App.2d 804, 809 (1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Leavens v. Pinkham and McKevitt*, 164 Cal 242, 247 (1912). . . . . . . . . . . . . . . . . . . . . . . . 19, 20

*Papadakos v. Soares*, 177 Cal. 411, 412 (1918) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Ukun v. Morton*, 203 Cal.App.3d 805, 806 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Baker v. Philbin*, 97 Cal.App.2d 393, 397 (1950 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*C & K Engineering Contractors v. Amber Steel Co.*, 23 Cal.3d 1, 6 (1978) . . . . . . . . . . . . . . . . . 8

*Desny v. Wilder*, 46 Cal.2d 715, 738 (1956) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Diamond Springs Lime Co. v. American Rivers Constructors*,
16 Cal.App.3d 581, 607 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Fairchild-Gilmore-Wilton Co. v. Southern Refining Co.*,
158 Cal. 264, 273 (1910)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Forgeron v. Hansen*, 149 Cal.App.2d 352, 359 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Forman v. Scott*, 231 Cal.App.2d 340, 342 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Grigsby v. Hagler*, 25 Cal.App.2d 714, 716 (1938) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Haase v. Cardoza*, 165 Cal.App.2d 35, 37 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Hannah v. City of Overland, Mo.*, 795 F.2d 1385 (8th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . 32

*Herman v. Brown*, 91 Cal.App.2d 758, 760 (1949) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Hinman v. Westinghouse Electric Co.*, 2 Cal.3d 956, 959 (1970) . . . . . . . . . . . . . . . . . . . . . . . 22

*Hogan v. Anthony*, 52 Cal.App. 158, 165 (1921) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Horsemen's Benevolent & Protective Assn. v. Valley Racing Assn.*,
  4 Cal.App.4th 1538, 1559 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

*Leff v. Gunter*, 33 Cal.3d 508, 515 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

*McChristian v. Popkin*, 75 Cal.App.2d 249, 256 (1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

*Mirabito v. Liccardo*, 4 Cal.App.4th 41, 46 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

*Mitchell v. Exhibition Foods*, 184 Cal.App.3d 1033, 1042 (1986) . . . . . . . . . . . . . . . . . . . . . . .  17

*Powell v. Goldsmith*, 152 Cal.App.3d 746, 751 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

*Reusche v. California Pacific Title Ins. Co.*, 137 Cal.App.2d 731,
  736 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

*Rodriguez v. Pacificare of Texas, Inc.*, 980 F.2d 1014 (5th Cir.),
  *cert. denied*, 113 S.Ct. 2456 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32

*Security Loan & Trust Co. v. Estudillo*, 134 Cal. 166, 169 (1901) . . . . . . . . . . . . . . . . . . . . . . .  18

*Spahn v. Guild Industries Corp.*, 94 Cal.App.3d 143, 155 (1979) . . . . . . . . . . . . . . . . . . . . . . . .  22

*Weber v. Leuschner*, 240 Cal.App.2d 829, 838 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

*Yachey v. Pacifica Development Co.*, 99 Cal.App.3d 776, 777 (1979 . . . . . . . . . . . . . . . . . . . . .  17

*Yanchor v. Kagan*, 22 Cal.App.3d 544, 548 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18– 20 -

TRIAL.BRF
- iv -

# INTRODUCTORY STATEMENT

This case does not concern fancy legal theories about statutes of limitations, why evidence should or should not be admitted,[1] or when Mike Love knew about his cousin's fraud. As the remaining claims in this action show, this case is now solely about injustice – where two people devoted their lives to creating music, but only one got the financial benefits, where one family member trusted the other and was betrayed. The inescapable fact here is that defendant Brian Wilson cheated plaintiff Michael E. Love in the 1960's, cheated him in the 1980's, and cheated him yet again in 1992 when he received $10 million for the rights to the songs that he and Mike Love wrote together.

The remaining claims are the culminations of those years of fraud. Wilson and his agents, Mason, Tierney,Landy and Branca believed that Mr. Love and Mr. Kory knew that Wilson and his attorneys were aware of the Abraham Somer conflict of interest as early as 1985. They also believed that Kory and Mr. Love had possession of incriminating documents which, if produced to the defendants in the Wilson Litigation would have resulted in summary judgment. Thus, Wilson and his attorneys took measures to keep Mr. Kory and Mr. Love "happy and ignorant." Their plan evolved into a simple promise: if Mike cooperates with his cousin, Wilson will (1) credit Mike on the songs they co-wrote, (2) reclaim the copyrights to those songs for both of them, (3) correct the old injustices concerning Wilson's receipt of Mike's royalties, and (4) pay Mike what he owed him from those past injustices. Unknown to Mike, Tierney and Little made these promises, James Tierney and James J. Little were editing a manuscript of Wilson's autobiography that contradicted those promises.

This case is now largely about those promises. There will be no doubt that Wilson, John Mason, James Tierney, James J. Little and Eugene Landy promised Mike Love money. Wilson and his agents made those promises in writing, oral, by telephone, in person, in front of Brian, in front of his advisors, and in front of the entire board of directors of Brother Records, Inc. and the various

---

[1] Wilson has filed twenty-two motions *in limine* in a vain attempt to prevent Mr. Love from putting on his case.

1 directors' attorneys. The evidence will show both the contents of the specific promises, the factual
2 setting that made it reasonable for Mike Love to believe those promises, how he was damaged by
3 that reliance, and how much he was damaged. In short, the evidence will show what everyone
4 knows -- even Brian -- that Brian got $10 million for Mike's and his songs and owes Mike Love
5 money.

6

7 **SUMMARY OF FACTS**

8 A. The 1960's.

9 In December 1961, Mike and Brian wrote the first Beach Boys song, "Surfin'." With that first
10 endeavor, Mike and Wilson began the songwriting partnership that gave the world so many classic
11 songs. The terms of the partnership were simple -- as one would expect from two teenagers who
12 were best friends and first cousins -- Mike and Brian would share the profits from the songs they
13 wrote equally. In early 1962, Brian and his father, Murry Wilson, formed a partnership called "Sea
14 of Tunes." According to Brian, he formed Sea of Tunes to "protect the songs from the public
15 domain." Because he had prior music experience, Wilson appointed Murry as the "administrator" of
16 the songs. On June 13, 1962, Brian secretly gave Murry his interest in Sea of Tunes -- thus, as of
17 that date, Murry owned the company without Mike's knowledge. Only a month later, on July 16,
18 1962, The Beach Boys entered a recording contract with Capitol Records. From 1961 through
19 1969, the Love/Wilson partnership produced 79 songs, such as "California Girls," "Good
20 Vibrations," "Surfin' USA," and many others. Throughout that time, Brian told Mike (and Mike
21 believed) that Brian was holding their songs in Sea of Tunes for both of their benefit. In 1964,
22 Brian's addiction to narcotics and hallucinogens began.

23 In 1965, while Mike and Brian were creating "California Girls," Brian secretly confirmed in
24 writing Murry's ownership of Sea of Tunes. Brian and Murry retained Abraham Somer as the Beach
25 Boys' lawyer and secretly incorporated Sea of Tunes in 1967. Finally, in 1969, Murry and Somer
26 sold Sea of Tunes to Somer's other client, Irving Music, while lying to Mike that everything was in
27 order and that he no rights to stop the sale. From 1965 into the 1980's Brian was a drug addict who

28

1 | was unable to perform with the Beach Boys. Despite his failure to perform, Mike, Carl Wilson and
2 | Alan Jardine continued to pay Brian a one-fourth share of their touring revenues.

3 |         B.     The 1980's.

4 |       In 1978, attorney John Branca became Brian's lawyer. In 1982, Branca became trustee over
5 | Wilson's property and threatened Ira Selsky of Irving Music with an audit of their royalty payments.
6 | He also threatened to overturn the 1969 Sale based on Abe Somer's conflict of interest. In 1983,
7 | Eugene Landy took control of Brian's life as part of a purported therapy, and began a well-known
8 | conflict with Mike which intensified over the years. In 1985, Landy demanded that Branca overturn
9 | the 1969 Sale based on the conflict of interest and on Brian's alleged incompetence. On February
10 | 19, 1985, Brian and Landy declared their independence from the Wilson Trust and Branca. On that
11 | same date, Branca wrote a letter to hire a law firm to overturn the 1969 Sale based on Brian's
12 | alleged incompetence and the conflict of interest. However, from 1985 through March, 1986,
13 | Branca failed to otherwise act, and the statute of limitations against Somer for legal malpractice
14 | expired.

15 |       In March, 1986, Landy and Brian terminated the Wilson Trust, hired Landy's lawyer, John
16 | Mason, to overturn the sale. between March, 1986 and June, 1986, Branca gave Mason all his files,
17 | including the files containing the February 19, 1985 letter. In August, 1986, Mason hired his friend,
18 | James Tierney to sue A&M Records/Irving Music. The fee agreement provided for a 25%
19 | contingency fee and one-half Tierney's hourly rate. Both Tierney and Mason realized that as a
20 | unaccredited co-author, Mike had equal claims against A&M and Somer to set aside the 1969 Sale,
21 | and that because of Branca's letter in 1985, the one year statute has passed. Notwithstanding that
22 | knowledge, on December 4, 1986, Mason confirmed to Branca and Robert Kory, Mike's attorney,
23 | that the 1969 Sale was "extremely suspect" from both Brian's and Mike's point of view. Three
24 | weeks later, Brian's accountant mailed Tierney's legal bills to Kory with an offer of one third of
25 | Brian's lawsuit. Mason told Kory that Mike had no rights but that Brian did based on Brian's
26 | incompetence. However, Mason promised to reclaim the copyrights for both Brian and Mike.

27 |       On May 11, 1987, Kory accepted Mason's offer, pending resolution of Landy's involvement

28 |

TRIAL.BRF             - 3 -

with Brian and in the context of a joint writing venture with between Mike and Brian. Needing some tolling theory, between 1986 and 1989, Mason and Tierney pursued the 1960's songwriter agreements from A&M Records in an effort to toll the statute of limitations. On September 7, 1988, Tierney told Brian and Abe Somer had a conflict of interest and had drafted a "grossly unethical contract" for the 1969 Sale. In August, 1989, Tierney and Mason finally received the songwriter agreements and filed suit one month later, on September 19, 1989. The primary issue in the litigation was when Branca, Mason, Tierney, Wilson and Landy discovered the conflict of interest, *i.e.*, the statute of limitations defenses.

C.      1989 - 1992: The Wilson Litigation.

There were problems with the lawsuit. Tierney and Mason knew that Mike had claims to the copyrights equal with Brian. Allowing him to participate in the lawsuit would cut Tierney's fee and Wilson's recovery by fifty percent. Further, Mason and Tierney knew that Kory had the 1986 Tierney bills in his files which could be very damaging to the case. Moreover, Tierney and Mason were not sure if Kory knew about Branca's letter in 1985 concerning the conflict of interest. It was therefore critical for Tierney and Mason to finesse Kory's and Mike's cooperation. To deal with these problems, Tierney and Mason renewed Mason's earlier 1987 promise to Kory, and in meetings with Kory, promised Mike retroactive credit for the songs, "whatever Mike was owed" or one third of the recovery, and a prospective share of the copyrights and income. At the same time, Tierney promised both Mason and Landy a five percent interest in the Wilson Litigation. Other witnesses were hired as "consultants" to ensure their cooperation. In a January 26, 1990 board meeting, Kory confirmed Tierney's promises to pay Mike retroactively, and Mason confirmed those promises in front of Brian, Landy, Kory, Mike and the rest of the Beach Boys and their attorneys.

During the case, Branca, Mason Tierney, Wilson, Landy and Little all lied about their knowledge of the Somer conflict of interest, claimed that Tierney's pre-1988 billing records were "lost," and concealed the critical 1985 Branca correspondence in their possession. However, Kory did not know much about the litigation or what documents had been produced -- he relied on Tierney and Mason. After the promises and the January board meeting, Little and Tierney were

given *carte blanche* to review Kory's attorney-client files, let Little handle the production of those documents, allowed Little to draft the privilege log for Mr. Kory, allowed Little and Tierney to prepare Mike for his deposition in the case and relied on Tierney's and Little's promise to represent Mike at the deposition.  At the same time, Mike demanded that Landy be removed from Brian's life and receive no part of the case, and Tierney agreed -- however, Landy threatened both Tierney and Mason with exposure of the early billing records and the Branca documents if they did not cooperate with him.

At his deposition, and while represented by Little and Tierney, Mason testified that he did not have any financial interest in the Wilson Litigation. However, just one month after the deposition, in January 1991, Mason signed a fee agreement (approved by Tierney) for 5% of the Wilson Litigation. Subsequent discovery has shown that the same fee agreement was drafted but unsigned at the time of Mason's deposition.  Billet, Wilson's conservator, called Mason a liar, and said that he relied on Mason's deposition testimony in refusing to pay Mason.

On March 15, 1991, Tierney sent an agreement for the removal of Landy to Bob Kory to appease Mike's strong desire to remove Landy from Brian's life.[2]  Confident that Tierney and Little were protecting Mike's interests, Kory did not retain litigation counsel.  Mike was deposed on March 31, 1991.  Little prepared Mike, and told him that he had to testify that he had no financial interest in the Wilson Litigation because the law required that such an interest be set forth in writing. At Mike's second day of deposition testimony, Tierney confirmed that Wilson will pay one third of the case or "whatever Mike is owed," and reclaim the copyrights for both of them.

Seven months later, the Court ordered Branca to produce his documents, but the key documents, *i.e.,* the February 1985 letters and the Tierney billing records from 1986 were not produced. In December, 1991, at the very close of discovery in the case, Tierney and Little submitted a declaration from Branca stating that he had no knowledge of the Somer conflict of interest prior to the filing of the Wilson Litigation in September 1989, and they produced a transcript

---

[2]  Tierney later stated that he had sent a copy of the Wilson Litigation complaint to Kory on March 15, 1991 and altered a messenger slip in an attempt to prejudice Mike's case against Mitchell, Silberberg & Knupp, Somer and Wilson.

of an interview with Chuck Kaye, the former president of Irving Music which revealed that Mike called Kaye in 1969 to protest the sale of the Sea of Tunes, but Kaye told him that he had no rights or ability to stop the sale. In March, 1992, Tierney was deposed. He testified that he was not retained for the case until 1988-89 (the 1986 billing records were concealed and reported lost by Little), that he didn't learn that Somer was Brian's lawyer in the 1969 Sale until 1989 (the Branca documents were concealed), he didn't reveal that his associate, Peter Anderson, worked on "Wilson v. A&M Records" in 1986 and he didn't reveal that he had a 1986 fee agreement with Wilson. After the deposition, Tierney and Billet settled the Wilson Litigation for $10 million. Tierney took over $4.3 million based on the secret 1986 fee agreement. Billet approved the fee, because he knew about the manipulated evidence in the case, and even though he had disputed Mason's fee agreement on similar grounds as Tierney's, i.e., that no fee agreement had existed until 1989, during which time Brian was unable to legally contract with Tierney. Billet also knew of Mike's claims. He therefore entered into the 1992 Settlement to defeat Mike's ability to enforce his rights under the bogus songwriter agreements and 1969 Letter. Mike Love, who wrote the songs and worked for thirty years touring with the Beach Boys and seeing to it that Brian continued to receive his share of the band's touring revenues, got nothing.

In July, 1992, Mike filed suit against Wilson, Somer and A&M records. In January 1993, Mike produced the Gibson, Dunn & Crutcher records to the defendants, including the 1986 Tierney billing record and the letter from Wilson's accountant referencing Wilson's offer for one third of the Wilson Litigation and Tierney wrote a false letter claiming that he gave Kory a copy of the Wilson Litigation complaint in March 1991, and alters a messenger slip to prove it. In June, 1993, Tierney wrote a false declaration to defeat Mike's rights but then withdrew it when he realized that he was caught in another lie. He next submitted another declaration blaming the first one on Rod Thompson, counsel for Mitchell, Silberberg & Knupp. In July 1993, Mike settled with Somer, Mitchell, Silberberg & Knupp and A&M Records, and proceeded against Brian.

## SUMMARY OF CLAIMS

Four claims remain for trial. Mr. Love's Sixteenth Cause of Action, for Wilson's violation of

1 the Lanham Act for the three years prior to the filing of this action deals with only one issue – to
2 what songs did Mike Love make a more than *de minimus* contribution, and how much money was
3 earned from those songs during the three years preceding the filing of the complaint. Since Mike's
4 contribution to the vast majority of the major royalty generating songs is undisputed, the Court
5 should find a matter of law that Mr. Love is at least entitled to three years of royalties for those
6 undisputed songs, such as the number one song "California Girls." The evidence to support this
7 claim will consist largely of Wilson's own testimony, and the testimony of the remaining Beach
8 Boys, Mike Love, Al Jardine, Carl Wilson, Bruce Johnston and David Marks.[3]

9 The Eleventh Cause of Action, Conspiracy to Defraud is premised on Wilson's conduct
10 during the 1992 Settlement of the Wilson Litigation. In essence, Wilson as Mike's fiduciary, lied to
11 Mike that the basis of the Wilson Litigation was Wilson's alleged incompetence. He represented to
12 Mike that only he could set aside the 1969 Sale and that he would represent and protect Mike's
13 rights to the songs, and would compensate Mike for the past royalties and give him his share of the
14 copyrights. Wilson knew of his promises to Mike, knew that Mike wrote the songs and was entitled
15 to share in the proceeds of the settlement, but out of greed for the $10 million, designed and
16 entered into a settlement agreement where he knowingly repudiated all of his positions in the
17 Wilson Litigation, including that the songwriter agreements were invalid, his signature forged on
18 the 1969 Letter. Through these lies, Wilson and his handlers hoped to defeat any claims by Mike
19 that he was entitled to a share of the settlement notwithstanding those promises.

20 The Eighteenth Cause of Action, alleging promissory estoppel and oral contract, is premised
21 on Wilson's promises to Mike. Brian, Mason, Tierney and Landy all promised Mike that (1) Brian
22 would reclaim the copyrights for both he and Mike, (2) Brian would pay Mike the royalties he owed
23 him for songs in the past for which Mike did not get credit, (3) Brian would give Mike the credit for
24 the songs for prospective royalties and (4) Mike would get one third of the monetary recovery from
25 the litigation. To support these promises, Wilson's Attorney's represented that since Plaintiff had no

26

---

27 [3] David Marks was on the earliest Beach Boys albums but was replaced by Al Jardine when Mr. Jardine rejoined to group.

28

TRIAL.BRF

- 7 -

legal claims against Wilson, Plaintiff had to rely on Wilson to reclaim the copyrights and that Wilson's Attorneys represented that the statute of limitations had run against Plaintiff's claims against Wilson after the 1969 Sale. To reinforce those promises, Eugene Landy, as Wilson's authorized agent, promised that Brian Wilson would pay Mike Love the millions of dollars that Brian owed him for failure to credit him as co-author. Landy also stated that if Brian won the Wilson Litigation, Mike Love would stand to gain millions of dollars. Of course, when Wilson settled his case, he took the $10 million, refused to pay Mike a dime, and forced Mike to file this action against him.

The Nineteenth Cause of Action, for Unjust Enrichment, simply seeks a portion of the $10 million as Wilson promised. Wilson has wronged his partner, received $10 million for partnership assets, and Wilson is unjustly enriched by that portion of the settlement promised to Mike.

## LEGAL ARGUMENT

### I.

### THE EIGHTEEN AND NINETEENTH CLAIMS

Wilson contends that the Eighteenth Cause of Action is not viable. As this Court has ruled in two summary judgment motions, based on thousands of pages of evidence, issues of fact remain for trial on these claims.

A.    Promissory Estoppel.

To establish promissory estoppel, the plaintiff only need show (1) a promise which the promisor should reasonably expect to induce action or forbearance from action of a definite and substantial character, (2) which induces such action or forbearance from action and (3) injustice will result if the promises are not enforced. *A-C Co. v. Security Pacific Nat. Bank*, 173 Cal.App.3d 462 (1985); *C & K Engineering Contractors v. Amber Steel Co.*, 23 Cal.3d 1, 6 (1978).

1.    **The Promises Made To Mike Love**.

Wilson, Mason, Tierney and Landy all made promises to Mike Love beginning in 1986 and continuing through May 1992, including the following specific promises:

    (1)    The songwriting partnership between Plaintiff and Wilson would continue;

    (2)    Wilson would seek to reclaim the copyrights to the Sea of Tunes Catalog on behalf of both of them in the Wilson litigation based on Wilson's incompetence;

    (3)    Upon reclaiming the copyrights, Wilson would then give Plaintiff his rightful ownership in the copyrights and credit for the songs he co-authored, including "California Girls";

    (4)    Wilson would pay Plaintiff the past royalties for which Plaintiff had not been paid;

    (5)    Wilson would pay Plaintiff prospectively for royalties due in the future on songs co-authored by Plaintiff; and

    (6)    Love would receive one third of any monetary recovery from the Wilson Litigation.

The record is replete with evidence supporting these several promises. In late 1986, Wilson, Mason, Landy and Branca met with Kory and Mr. Love to enlist Mr. Love's aid in the investigation into the 1969 Sale. In that meeting, they went over a list of the songs for which Mr. Love did not receive proper credit. Wilson, Mason and Landy left the room, deliberated, re-entered the room and told Mr. Love that Wilson would pay him from the action they contemplated filing. Shortly thereafter, Sean Corrigan, on behalf of Wilson, promised Mike one third of the recovery in the Wilson Litigation. *See* December 22, 1986 Letter from Corrigan to Kory; Kory 713:16 - 714:3. Tierney and Little promised that "Mike would share in the copyrights and songs that he cowrote with Brian. Kory 468:22 - 469:3. Tierney also promised on Wilson's behalf that if Mike cooperated, "we will meet our obligation to share the recovery or the songs with you." Kory 479:1 - 480:4. This was intended to be an enforceable agreement. Kory 177:15 -178:1. Mr. Love would receive a portion of the monetary award. Kory 713:16 -714:3. The reasons for these promises was simple – Tierney and Mason needed Mr. Love's cooperation or they would face the danger of the smoking guns surfacing.

Thus, their conduct from 1986 through the 1992 Settlement towards Mr. Love was one of appeasement, of promises, and deceit. Accordingly, Wilson promised that Love would share in the copyrights and songs that they co-wrote. Kory 468:22 - 469:3. Mason confirmed those promises at the January 1990 BRI board meeting in front of Wilson, Landy, Mike Love, Kory and the rest of The Beach Boys. Kory 476:17 - 477:21. They were "publicly affirmed promises . . . made at least twice . . .in the context of fiduciary relationships." Kory 481:13 - 482:8. It was a "direct commitment from Brian." Kory 653:4-20.

Mr. Love's cooperation was the bargained-for consideration in the transaction[4]. Kory 177:15 - 178:1. Mr. Love allowed Tierney to search through his attorney-client files. Kory 270:2 - 271:1. Mr. Love also made himself available for preparation of his deposition in the Wilson Litigation. Kory 275:17 - 277:4. Kory was affirmatively discouraged from pursuing claims against Wilson because Wilson would pursue, at no cost to Mr. Love, recovery of the copyrights . Kory 588:16 - 589:12. Both Tierney and Little told Kory not to hire a litigator to represent Mr. Love, because they would represent him at the deposition and prepare him before it.

In addition to demanding that Wilson's fraud be corrected, Mr. Love also wanted to remove Landy from Wilson's life. Knowing that this was the final item to appease Mr. Love prior to his deposition, Tierney included Kory in confidential meetings to eliminate Landy. Kory 587:10-23. Finally, on March 15, 1994, only two weeks before Mr. Love's deposition, Tierney sent Kory a draft agreement for the removal of Landy. The deal was done. Subsequently, under Little's tutelage, Mr. Love was maneuvered into helping Wilson with his case and severely jeopardizing his own claims.

## 2. Damages

As the Court is aware, Wilson received $10 million in settlement of his claims. He paid Mr. Love nothing from that settlement in breach of his promises. Instead, he as denied the contract, denied the promises, and forced Mr. Love to expend hundreds of thousands of dollars in attorneys' fees in an attempt to rectify Wilson's breach. Based on Wilson's promises, Mr. Love's damages are

---

[4] This consideration was in addition to Wilson's obligation to repay Mr. Love to rectify his fraud.

1 several.

2     First, Wilson promised Mr. Love that he would pay him what he owed in royalties for the
3 songs that they co-authored but for which Wilson did not give Mr. Love credit. Accordingly, one
4 measure of Mr. Love's damages is the amount of money Wilson owed Mr. Love for past royalties.
5 To show this, Mr. Love will introduce evidence that he co-authored the songs in the Sea of Tunes
6 catalog, and introduce evidence of what each of the songs that Mr. Love co-wrote earned Wilson in
7 royalties. Wilson also promised to correct the erroneous songwriter contributions reflected in the
8 Sea of Tunes songwriter agreements. Mr. Love will also demonstrate the lost future profits from
9 Wilson's failure to correct the songwriter credits for the Sea of Tunes songs.   In the alternative,
10 Wilson promised Mr. Love one third of the Wilson Litigation. Therefore, Wilson owes Mr. Love at
11 least $3.333 million.

12     B.    Unjust Enrichment.

13     It is an axiomatic doctrine in California that one cannot profit by his own wrong. *Gladstone*
14 *v. Hillel*, 203 Cal.App.3d 977, 988 (1988). Accordingly, Mr. Love's unjust enrichment cannot be
15 questioned.   If Wilson promised Mr. Love the money described above, but failed to pay him,
16 Wilson has been unjustly enriched by that amount. *Calistoga Civic Club v. Calistoga*, 143
17 Cal.App.3d 111, 116 (1983); *Martin v. Kehl*, 145 Cal.App.3d 228, 237 (1983); 1 Witkin, Summary
18 of California Law, Contracts, § 105, p.131.

19     There are two additional theories of unjust enrichment as well. First, Wilson has clearly
20 been unjustly enriched by his receipt of Mr. Love's royalties. There is no rhyme or reason why
21 Wilson should be permitted to keep these ill-gotten gains, and Wilson does not even want to – he
22 has wanted to pay Mr. Love from the beginning of the case. Second, Wilson was paid $10 million
23 for partnership assets created by Mr. Love and Wilson. Therefore, as a matter of law, Wilson must
24 account to Mr. love for Mr. Love's share of the profits from the partnership assets. A partner has an
25 absolute obligation to share the profits of the partnership with his partners, *no matter when that*
26 *opportunity arose*, even twenty years after the partnership. *Leff v. Gunter*, 33 Cal.3d 508, 515
27 (1983). Furthermore, to the extent that this Court does not declare Mr. Love's rights to the future

28

1 royalties from the songs that Mr. Love co-wrote with Wilson, Wilson will be unjustly enriched by
2 his receipt of those future royalties. Under any theory, Mr. Love is entitled to both a share of the
3 $10 million settlement and a share of the future royalties.

4         C.    Conspiracy To Defraud.

5         Mr. Love's Eleventh Cause of Action is based on the same representations supporting Mr.
6 Love's promissory estoppel claim. However, in addition, the evidence will show that Wilson knew,
7 at the time the promises were made to Mr. Love, that the promises were false and had no intention
8 of performing. Thus, Wilson is also liable for fraud. Cal. Civil Code § 1710(4) ("fraud" defined as a
9 promise made without any intention of performing it). In making these promises, Mr. Love will
10 show that Wilson conspired with Eugene Landy, John Mason and James Tierney to make the
11 promises to Mr. Love and that the group agreed to make the promises to defraud Mr. Love out of the
12 proceeds of the lawsuit that became the Wilson Litigation filed in September 1989.[5]   But for those
13 promises, Mr. Love would have filed suit against Mr. Wilson in 1986, or at a minimum, moved to
14 intervene in the Wilson Litigation. His lawsuit against MS&K and Irving would not have had to be
15 settled for a fraction of its value had it been brought in 1986. Moreover, had Mr. Love participated
16 in the Wilson Litigation, Wilson could never have made the claims against Mr. Love that he is now
17 making, regarding the songwriter agreements, the 1969 Letter, the litigation privilege and the parol
18 evidence rule (both of which have been partially adopted by the Court here). Instead, Mr. Love
19 would now be sitting with $5 million of the settlement and he would not have been subjected to
20 this litigation. Similar to the promissory estoppel claim, the damages from the conspiracy are the
21 loss of the copyrights, the lost future income from the songs and the lost past royalties.

22                                                     **II.**

23               **MR. LOVE'S BREACH OF CONTRACT CLAIM**

24         Mr. Love's Eighteenth Cause of Action also includes a claim for breach of oral contract.

25

26         [5]  Contrary to Wilson's claims, Mr. Love does not claim that the 1992 Settlement agreement
constituted the conspiracy to defraud. Instead, as Mr. Love recounted in his Opposition to Wilson's
27 Motion for Summary Judgment on the Eleventh Cause of Action, the 1992 Settlement Agreement
was the last overt act of the conspiracy
28

1  Simply, the essential difference between promissory estoppel and breach of oral contract is that

2  under the doctrine of promissory estoppel, a court will enforce a promise without consideration if

3  justice requires it, while an oral contract requires each of the elements of a valid contract. *See A-C*

4  *Co. v. Security Pacific Nat. Bank*, 173 Cal.App.3d 462 (1985).

5      A.    Mr. Love Will Prove Every Element Of A Contract.

6      A contract is an agreement to do or not to do a certain thing. Cal. Civil Code § 1549. There

7  must be (1) parties capable of contracting, (2) their consent, (3) a lawful object and (4) sufficient

8  consideration. Civil Code § 1550. The terms of the contract can be express, or can be implied by

9  the conduct of the parties. Civil Code §§ 1619, 1620, and 1621.

10      The Agreements. As discussed above, numerous promises were made to Mr. Love beginning

11 in 1986 and continuing through 1991. Wilson promised to correct his fraudulent theft of Mr. Love's

12 songs and Mr. Love promised (1) not to sue Wilson and (2) to cooperate fully with Wilson in the

13 Wilson Litigation.

14      Capacity of the parties. At the time the promises were made to Mr. Love in 1986, Wilson

15 was fully competent. There is no admissible evidence to the contrary. And even if, *arguendo*, there

16 was some scintilla of admissible evidence that Wilson was not fully competent in 1986 at the time

17 the promises were made, Wilson was present with his former psychotherapist and not one, but two

18 separate lawyers, one of whom is reputed to be the biggest entertainment lawyer in the United

19 States.[6] Thus, even to the extent that he lacked capacity, he was represented by counsel and agents

20 and manifested his consent to the promises. Therefore, Wilson's capacity to make the promises

21 cannot be questioned.  There is no evidence that Mr. Love lacked capacity.

22      Consent. There is also no question that the parties consented to the agreement. Wilson

23 made the offer to Mr. Love. Mr. Love agreed. After the meeting, Wilson's agents memorialized the

24 agreement with a letter stating that Mr. Love had a one third interest in the contemplated lawsuit.

25 Mr. Love accepted both in writing, in March 1987, and by his conduct. Cal. Civil Code § 1584

26

27      [6] That same lawyer, John Branca, also advised Wilson the year before that Mr. Love's claims
for a portion of the royalties from "California Girls" was time-barred. In addition, Branca also
represented The Beach Boys at the same time.

28

1 provides:

2      performance of the conditions of a proposal, or the acceptance of the consideration
3      offered with a proposal, is an acceptance of the proposal.

4 Mr. Love performed the conditions of the promises and Wilson accepted the consideration offered.
5 Therefore, Mr. Love has established the element of consent.[7]

6      The Object.  The object of the contract is merely the thing which the party receiving the
7 consideration has agreed to do or not to do.  Civil Code § 1595.  The only requirement is that the
8 object of the contract be possible and ascertainable when the contract is to be performed.  In this
9 case, the object of the contract is Wilson's payment of past due royalties to Mr. Love or a third of
10 the Wilson Litigation, and correcting the songwriter credits on the Sea of Tunes songs prospectively.
11 Such an object is neither impossible nor is it difficult to ascertain.

12      Consideration.  Any benefit conferred, or agreed to be conferred on the promisor or any
13 prejudiced suffered as an inducement to the promisor is good consideration for a promise.  Cal.
14 Civil Code § 1605. There should be no doubt that there is sufficient consideration given by Mr.
15 Love.

16      For example, consideration may be forbearance to sue on a claim, extension of time, or any
17 other giving up of a legal right, in consideration of some promise.  *Coldwell Banker & Co. v. Pepper*
18 *Tree Office Associates*, 106 Cal.App.3d 272, 280 (1980).  The slightest forbearance will suffice.
19 "Even though the forbearance is for one day only, there is sufficient consideration as the law does
20 not weigh the quantum."  *Krobitzsch v. Middleton*, 72 Cal.App.2d 804, 809 (1946).  Both Mr. Love
21 and Mr. Kory will testify that Mr. Love forbore from filing suit against Mr. Wilson in reliance on his
22 promise to pay Mr. Love and reclaim the copyrights for both of them.  That forbearance alone is
23 sufficient.  Wilson contends that Mr. Love's forbearance is not adequate because his claims against
24 Wilson were not valid.  Wilson's position is incorrect.  The compromise of a doubtful claim is still

25

26      [7] Even if Wilson contends that he did not consent in 1986-87, he clearly accepted the
benefits of Mr. Love's performance in 1991.  "A contract which is voidable solely for want of due
27 consent, may be ratified by a subsequent consent."  Civil Code § 1588. Moreover, "a voluntary
acceptance of the benefit of a transaction is equivalent to a consent to all the obligations arising
from it. . ."  Civil Code § 1589.

28

1  sufficient. *Baker v. Philbin*, 97 Cal.App.2d 393, 397 (1950).  As long as the forbearing party
2  believes that the claim may be fairly determined to be valid or the claim is doubtful because of
3  uncertainty as to the facts or the law, forbearance is sufficient consideration.  Restatement (Second)
4  Contracts, § 74(1).

5       A moral obligation originating in some benefit conferred on the promisor or prejudice
6  suffered by the promisee is also good consideration.  Civil Code § 1606.  Courts have construed this
7  section to mean that  a moral obligation will support a promise where a valuable consideration once
8  existed but where the formerly valuable claim is barred by the statute of limitations.  *Haase v.*
9  *Cardoza*, 165 Cal.App.2d 35, 37 (1958); *Desny v. Wilder*, 46 Cal.2d 715, 738 (1956).  Even if Mr.
10  Love's 1960's fraud claims are barred, those claims were certainly valid at one point, and Mr.
11  Wilson's admitted fraud on Mr. Love in the 1960's therefore is sufficient consideration.

12       Furthermore, in a bilateral contract, where there is an exchange of promises by the parties,
13  each promise is consideration for the other.  *Papadakos v. Soares*, 177 Cal. 411, 412 (1918).  Thus,
14  Mr. Love's promises of cooperation, and his forbearance from suit is consideration for Wilson's
15  promise to pay him.

16       Consideration is not even necessary where a promise revives a time-barred debt.  *Forman v.*
17  *Scott*, 231 Cal.App.2d 340, 342 (1964).  However, a promise reviving a time-barred debt must be
18  evidenced by some writing.  Cal. Code. Civ. P. § 360.  The writing need not be in any particular
19  form, including informal writings such as letters.  *Herman v. Brown*, 91 Cal.App.2d 758, 760
20  (1949).  Sean Corrigan's December 22, 1986 letter is such a writing.  Nor can the validity of the
21  consideration be attacked after the contract has been fully executed.  *Julian v. Gold*, 214 Cal. 74, 76
22  (1931).

23       No matter which form of consideration the Court adopts, Mr. Love has shown that his and
24  Wilson's contract is supported by consideration.  In any event, Wilson bears the burden of
25  invalidating a contract on the ground that there is no consideration .  Civil Code § 1615.

26       B.    Wilson's "Defenses" Are Not Meritorious.

27       Wilson contends that the promises are not actionable because they are "uncertain," and that

28

TRIAL.BRF                                              - 15 -

1   Wilson's conservator somehow "cancelled" the contract.  Neither argument has merit.

2                    1.   **The Promises Are Not "Uncertain."**

3         The Court must interpret a contract to give effect to the mutual intent of the parties.  Civil

4   Code § 1636.  The contract can be explained by reference to the circumstances under which it was

5   made.  Civil Code § 1647.  Moreover, if the terms are ambiguous or uncertain, the promise should

6   be interpreted in the manner in which the promisor believed that the promisee understood it.  Civil

7   Code § 1649.  Moreover, where one party claims that the contract is uncertain, the language of the

8   contract should be construed most strongly against the party who caused the ambiguity or

9   uncertainty.  Civil Code § 1654.

10        A contract will be sufficiently definite if the court can ascertain the parties' obligations and to

11  determine whether these contractual obligations have been performed or breached.  *Horsemen's*

12  *Benevolent & Protective Assn. v. Valley Racing Assn.*, 4 Cal.App.4th 1538, 1559 (1992).  "The

13  contract will be enforced if it is possible to reach a fair and just result, even if, in the process, the

14  court is required to fill in some gaps."  *Id.*  Thus, in *Ukun v. Morton*, 203 Cal.App.3d 805, 806

15  (1988), the court enforced an agreement between partners to share the profits from future business

16  ventures on a "mutually agreeable basis."  *Id.*  The court noted that "the modern law trend favors

17  carrying out the parties' intent, and disfavors holding them unenforceable because of uncertainty."

18  *Id.* at 807.

19        Wilson's promises are definite and certain.  The parties have agreed on the majority of the

20  songs for which Wilson owes Mr. Love, and to the extent that some songs are disputed, if any, the

21  contract is enforceable as to those songs which are agreed.  Wilson has agreed to pay Mr. Love for

22  those songs and to correct the songwriter designations for future royalties.  In fact, at the meeting in

23  1986 where the promises were initially made, Wilson had a list of songs for which he needed to

24  give Mr. Love credit.

25        The necessity of future agreement on limited phases of a transaction does not prevent

26        the birth of a binding contract upon acceptance, since, if the parties cannot agree on

27        those phases, each one may force the other to accept the determination of a court of

28

1  equity.

2  *Yachey v. Pacifica Development Co.*, 99 Cal.App.3d 776, 777 (1979). Even if the court determined

3  that some terms of the contract remained open, it still must enforce the contract. In addition, since

4  Wilson caused the uncertainty, any such ambiguity must be construed against him. Finally, where

5  the parties to the agreement are fiduciaries, as are Mr. Love and Wilson, the "certainty" issue must

6  be construed with even greater liberality. *Boyd v. Bevilacqua*, 247 Cal.App.2d 272, 288 (1966).

7  While Mr. Love strongly contends that there is no uncertainty, construing the promises most

8  strongly against Wilson -- as the Court must, -- Wilson cannot possibly show that there was an

9  uncertainty that could not be cured by a court of equity. Finally, when different constructions of a

10  contract are otherwise equally proper, the court must accept the construction of the party in whose

11  favor the contract was made. *See Mitchell v. Exhibition Foods*, 184 Cal.App.3d 1033, 1042 (1986).

12      2.   **The Conservator "Cancellation" Theory.**

13  Wilson also contends that Jerome Billet, as Conservator for Wilson, cancelled the contract.

14  This theory is pure nonsense. The promises were made well before Mr. billet appeared on the

15  scene. Mr. Love performed all his obligations under the contract, and it was only after all

16  performance, when Wilson was required to pay Mr. Love, that the contract was "cancelled," if at all.

17  "Cancellation" is only applicable when the other party has breached the contract, and the

18  non-breaching party terminates the contract while retaining any remedy for breach. *See generally*, 1

19  WITKIN, Summary of California Law, § 868, p. 781 (9th ed. 1987). Moreover, cancellation is an

20  affirmative defense, which was not pled and therefore is waived. In addition, even assuming that

21  such a claim were <u>potentially</u> feasible, Wilson's cancellation is ineffective because it is too late. Mr.

22  Love already performed, and Wilson obtained his $10 million. *See* Cal. Civil Code § 1692.

23  "Rescission" is actually the proper term for what Wilson is meritlessly is attempting to

24  accomplish. However, even if otherwise proper, rescission is inappropriate since it only abrogates

25  so much of the contract as unperformed -- all prior accrued rights remain and are enforceable. Since

26  Mr. Love has fully performed, and all that remains is Wilson's bargained-for performance, Wilson

27  still owes Mr. Love. *See Fairchild-Gilmore-Wilton Co. v. Southern Refining Co.*, 158 Cal. 264, 273

28

TRIAL.BRF       - 17 -

1   (1910) (defaulting party cannot rescind).  Furthermore, assuming *arguendo* that there were no
2   accrued rights, Wilson would still have to restore all consideration received, and any compensation
3   to Mr. Love which justice requires, such as a portion of the $10 million. Civil Code § 1692; 1
4   WITKIN, Summary of California Law, § 885, p.794 (9th ed. 1987).  Retention of the benefits of the
5   contract constitutes a waiver of the rescission, as well.  *See Hogan v. Anthony*, 52 Cal.App. 158,
6   165 (1921).

7        Thus, even if the conservator could rescind the promise, which he cannot, Wilson still owes
8   Mr. Love full performance.

9                                    **III.**

10   **MASON AND TIERNEY WERE WILSON'S AGENTS  WITH AUTHORITY TO BIND WILSON**

11        Out of desperation, Wilson contends that his attorneys were not his agents, and if they were
12   his agents, they did not have the authority to offer Mr. Love any compensation whatsoever.  The
13   argument ignores the fact that Wilson himself made those same promises to Mr. Love, and that these
14   promises were made by his agents in his presence.  There is no question that even if Wilson did not
15   actually speak the promises, by allowing his agents to make the promises without any disavowal by
16   Wilson, the promises are binding on Wilson.

17        An attorney is the agent for his client. *Yanchor v. Kagan*, 22 Cal.App.3d 544, 548 (1971).
18   The attorney-client relationship is governed by rules applicable to the relationship of principal and
19   agent in general.  *Id.* Hence the client as principal is bound by the acts of the attorney within the
20   scope of his actual authority (express or implied), or his apparent, or ostensible authority.  *Id.* For
21   almost one hundred years, there has been a strong presumption of authority to act for a client with
22   respect to matters related to legal proceedings. *Security Loan & Trust Co. v. Estudillo*, 134 Cal. 166,
23   169 (1901).  Accordingly, an attorney can give up claims against one person to fortify claims against
24   another. *Diamond Springs Lime Co. v. American Rivers Constructors*, 16 Cal.App.3d 581, 607
25   (1971). Tierney, Little and Mason had both actual and ostensible authority to make and reaffirm the
26   promises to Mr. Love.

27        A.    Mason And Tierney Had Actual Authority.

28

TRIAL.BRF                              - 18 -

1    Both Mason and Tierney had actual authority to promise Mr. Love a share of the case which
2  ultimately became the Wilson Litigation. Mr. Love intends to produce evidence that, while in
3  attendance at a meeting, Wilson's attorneys, in Wilson's presence, represented to Mr. Love that they
4  would pay Mr. Love for his authorship of the Sea of Tunes catalog songs from the proceeds of the
5  Wilson v. Irving litigation. *This representation occurred in the presence of both Mr. Love and*
6  *Wilson.* Wilson agreed to it, then had an accountant send a letter confirming the agreement. If a
7  principal by his acts has led others to believe that he has conferred authority upon an agent, he
8  cannot be heard to assert, as against third persons who have relied and acted thereon in good faith,
9  that he did not intend to confer such power. *Yanchor v. Kagan*, 22 Cal.App.3d 544, 549 (1971).
10 Certainly Wilson's agreement and his later confirmation of the agreement by letter manifests his
11 intention to confer authority upon his attorney to negotiate with Love on his behalf. Therefore, Mr.
12 Love was duly justified in relying on the agency relationship that existed between Wilson and his
13 attorneys.

14    Even if Wilson had remained silent as his attorneys-agents acted with authority in extending
15 the offer, his silence gives rise to his liability for his attorneys-agents actions. Where the principal
16 knows that the agent holds himself out as clothed with certain authority, and remains silent, such
17 conduct on the part of the principal may give rise to liability. *Leavens v. Pinkham and McKevitt*,
18 164 Cal 242, 247 (1912).

19    In addition, Wilson established the continued agency of his attorneys in a telephone
20 conversation to Mr. Love on August 27, 1992, in which Wilson told Mr. Love that he instructed his
21 attorneys to pay Mr. Love. Based on Wilson's representation to Mr. Love, Mr. Love had every
22 reason to rely on Wilson's representation that his attorneys are authorized to act on Wilson's behalf.
23 *See Forgeron v. Hansen*, 149 Cal.App.2d 352, 359 (1957) (agent has the implied authority to do
24 what the principal has manifested or expressed). The record is replete with specific statements and
25 acts by Wilson as principal empowered Tierney, Mason and Landy to act on his behalf. Wilson
26 does not even dispute that he wanted, and still wants to pay Mr. Love the money that he owes him.
27 Thus, Mason, Tierney and Little had actual authority to act for Wilson.

28

TRIAL.BRF                                                          - 19 -

B.      Mason And Tierney Had Apparent Or Ostensible Authority.

The same facts support a finding that Mason, Tierney and Little had apparent or ostensible authority. If a person of ordinary prudence would be justified in assuming that Mason. Tierney and Little had authority to perform a particular act and deals with the apparent agents upon that assumption, Wilson is bound by their acts. Cal. Civil Code § 2317.

The nature of ostensible authority is one of estoppel. 2 WITKIN, Summary of California Law, Agency, § 93, p. 92 (9th ed. 1987). Ostensible authority can be established where the principal knows that the agent holds himself out as having authority and remains silent, *i.e.,* inaction. *Leavens v. Pinkham & McKevitt,* 164 Cal. 242, 247 (1912). Further, ostensible authority can be found where the principal puts the agent in a position to commit fraud on third persons. *Reusche v. California Pacific Title Ins. Co.,* 137 Cal.App.2d 731, 736 (1965). Where a principal by his acts has led others to believe that he has conferred authority upon his agent, he cannot assert, as against third persons who have relied and acted thereon in good faith, that he did not intend to confer that authority. *Yanchor v. Kagan,* 22 Cal.App.3d at 549.[8]

Accordingly, in *Yanchor,* the court held the client bound by the unauthorized surrender of his substantive rights against a defendant. *Yanchor,* 22 Cal.App.3d at 549. The client had told the defendant to speak with his attorneys, sat in on a meeting when his attorney spoke of offering a "covenant not to sue" and therefore was bound. As recounted above, like the client in *Yanchor,* Wilson is also bound by the acts of his agents, whether authorized or not.

C.      Wilson Is Liable For The Torts Of His Agents.

Wilson is liable for the torts of Mason, Tierney and Little in this case, both because he

---

[8] Wilson contends that Tierney and Mason could not have been acting within any apparent or ostensible authority because they were offering a witness money for his testimony in violation of ethical rules. First, the ethical rules have only been admitted in legal malpractice actions on the issue of whether there was a breach of the care owed to the client. *See Mirabito v. Liccardo,* 4 Cal.App.4th 41, 46 (1992), there is no case that limits an attorney's ostensible or actual authority pursuant to ethical rules. The fact that the Tierney Firm offered money to several witnesses in the Wilson Litigation in violation of an ethical rule may give Wilson another reason to sue Tierney for malpractice, but does not limit Tierney's ostensible or implied authority. In addition, Tierney violated no ethical rules by promising Mr. Love that Wilson would pay him the royalties he stole, independently of the Wilson Litigation if Mr. Love cooperated.

1  directly authorized his agents to perform a tort, because the evidence will show that Wilson ratified
2  the tortious acts of his agents, and under the doctrine of *respondeat superior*.

3              1.      **Wilson Directly Authorized The Tortious Conduct.**

4          The evidence introduced at trial will show that Wilson directly authorized and set in motion
5  the course of tortious conduct which included the deceit on his cousin, Mr. Love. It is and was no
6  secret that Mr. Wilson wanted to pay Mr. Love for past royalties due to Mr. Love. He attempted to
7  give Mr. Love a royalty check for half of the songwriter royalties on "California Girls" in 1985 but
8  was stopped by John Branca. He attended a meeting with Mr. Love and Mr. Kory in late 1986
9  where he and his attorneys promised to pay Mr. Love the past royalties. Wilson told Mr. Love and
10 Mr. Kory to deal with his attorneys on the investigation of the 1969 Sale. As in *Yanchor*, Wilson
11 held his attorneys out as authorized to deal with Mr. Love on these issues. Because Wilson came
12 back into the meeting with the offer to pay Mr. Love from the case he contemplated filing (allegedly
13 based on his incompetence), the only inference a reasonable jury could draw was that Wilson
14 directly authorized the offer to Mr. Love.

15             2.      **Wilson Ratified The Torts Of His Agents.**

16         Even if there was not clear evidence that his agents' misconduct was directly authorized,
17 there is additional evidence that Wilson ratified his agents' tortious conduct. Wilson is liable even
18 for an originally unauthorized tort of Mason, Tierney or Little by his subsequent ratification of their
19 acts. *Weber v. Leuschner*, 240 Cal.App.2d 829, 838 (1966). Wilson's failure to discharge Mason or
20 Tierney is evidence of Wilson's ratification. *McChristian v. Popkin*, 75 Cal.App.2d 249, 256 (1946).
21 Further, if Wilson had the mere opportunity to learn of Tierney's and Mason's misconduct, and
22 permitted them to continue in his employment, Wilson is liable for even punitive damages as an
23 abettor. *Id.*[9]

24

25         [9] Wilson also contends that he is not liable for punitive damages because he is incompetent.
   That is untrue. Preliminarily, Wilson cannot show by any admissible evidence that he was
26 incompetent at the time the promises were made in either the 1980's or in 1990-1991. He was well
   enough to execute two legally binding fee agreements in 1989 with Tierney and Mason. He was in
27 the best of health in 1990, according to his sworn testimony. Further, he never had felt better in
   1991 when his autobiography was published. Second, as discussed, he is liable for the punitive
28

TRIAL.BRF                                                                                  - 21 -

1        Although Mr. Love will show that Wilson had <u>actual</u> knowledge of the misconduct, Wilson
2    unquestionably had the opportunity to discover the misconduct. At the January 1990 BRI board
3    meeting, which Wilson chaired as chairman of the board of directors, he permitted his agent, Mason
4    to make promises of millions of dollars to Mr. Love from the Wilson Litigation, yet did nothing, said
5    nothing nor terminated or otherwise reprimanded Mason. Instead, he called Mr. Love and told his
6    that he looked forward to writing with Mr. Love again. Additionally, he called Mr. Love in August
7    1992 and told Mr. Love that he was right to sue him, that he owed Mr. Love money and wanted to
8    pay him. He also told Mr. Love's wife that he recently received the settlement and wanted to pay
9    Mr. Love for the songs. Those are not the statements of someone attempting to repudiate any
10   agreements or torts of his agents. Wilson ratified Tierney's and Mason's acts.

11       3.    **Wilson Is Liable Under The Doctrine Of *Respondeat Superior*.**

12       Even where his agents are alone at fault, the innocent principal is liable for the torts of his
13   agents acting within the scope of their employment. *Hinman v. Westinghouse Electric Co.*, 2
14   Cal.3d 956, 959 (1970). It is immaterial that the agents acted in excess of their authority or even
15   contrary to their instructions. *Id. See Grigsby v. Hagler*, 25 Cal.App.2d 714, 716 (1938) (principal
16   without knowledge of fraud still liable); *Spahn v. Guild Industries Corp.*, 94 Cal.App.3d 143, 155
17   (1979) (principal liable based on theory of imputed knowledge of agent's fraud). This rule applies to
18   subagents such as Little. *See*, Civil Code § 2351.

19       If the principal places the agent in a position to defraud, and the third party relies upon the
20   agent's apparent authority to make the representations, the principal is liable even though the agent
21   is acting for his own purposes. *See Spahn*, 94 Cal.App.3d at 156. The theory is that the agent's
22   position facilitates the consummation of the fraud, in that from the point of view of the third person
23   the transaction seems regular on its face and the agent appears to be acting in the ordinary course of
24   the business confided to him. 2 WITKIN, Summary of California Law, Agency and Employment, §
25   141, p. 138 (9th ed. 1987). Thus, even if Tierney and Mason made the misrepresentations to Mr.
26   Love solely to increase the contingency fee that Mason and Tierney would receive from the Wilson

27   ―――――――――――――――――――

damages imposed as a result of his agents' misconduct.
28

1 Litigation and Wilson obtained no benefit whatsoever from their agreement with Mr. Love, Wilson
2 is still liable for their fraud.

3 A variation of this theory occurs when the principal authorizes the agent to enter into
4 transactions in which representations about the subject matter are usually made, the principal is
5 liable for misrepresentations reasonably related to the transaction. Restatement (Second) Agency, §
6 258. Thus, where Wilson wanted his attorneys to work out an agreement with Mr. Love and enlist
7 his cooperation in the investigation of the 1969 Sale and the subsequent lawsuit, Wilson is liable for
8 any of Tierney's' and Mason's misrepresentations concerning either the subject matter of the
9 lawsuit, the investigation or Mr. Love's benefits from the lawsuit.

10 Finally, if the principal retains the benefits of a transaction induced by fraud, he is liable for
11 damages, unless he immediately repudiates the agents' acts and gives up any benefits received.
12 *Powell v. Goldsmith*, 152 Cal.App.3d 746, 751 (1984). Wilson has not only not repudiated
13 Tierney's and Mason's acts but he has failed to give up the benefits he has received from Mr. Love's
14 cooperation. Such benefits are inextricably linked to the settlement. For example, it is possible that
15 without Mr. Love's cooperation, there would not have been a settlement in the case, or Wilson
16 might have only received half of the settlement had Mr. Love intervened in the litigation.

17 Under any or all of these theories, Wilson is liable for the acts of both Tierney, Mason and
18 Little.

19 **IV.**

20 **EVIDENTIARY ISSUES**

21 A.    Evidence Supporting Mr. Love's Dismissed Claims Is Still Relevant To The Remaining
22        Claims.

23 The Federal Rules of Evidence provide that "[a]ll relevant evidence is admissible." Fed. R.
24 Evid. 402. "Relevant evidence means evidence having any tendency to make the existence of any
25 fact that is of consequence to the determination of the action more probable...than it would be
26 without the evidence." Fed. R. Evid. 401. Evidence supporting Mr. Love's dismissed claims is
27 clearly relevant to the remaining claims.

28

TRIAL.BRF                                                                                    - 23 -

1        1.    **The 1960's Facts Are Relevant To Whether The Promises Were Made.**

2        It should be apparent that Mr. Love's evidence showing that he was defrauded out of the
3   copyrights and royalties by Wilson and Murry in the 1960's, tends to make it more likely that
4   Wilson made the promises to pay Mr. Love in the 1980's. Otherwise, if Mr. Love had no claim to
5   either the royalties or the copyrights, Wilson's promise to rectify his past fraud would be unlikely,
6   since there would be no past debt to rectify. Similarly, evidence that Wilson owed Mr. Love
7   millions in royalties from the 1960's tends to show that it was more likely that Wilson made
8   promises to pay Mr. Love millions of dollars to correct that misappropriation in the 1980's. Wilson
9   denies that any promises were made. Thus, Mr. Love will necessarily be introducing evidence
10  concerning Murry Wilson, Sea of Tunes, the 1969 Sale, etc. to show the circumstances which tend
11  to prove that the promises were actually made.

12       In addition, the 1960's facts are relevant to Wilson's motivation for making the promises in
13  the first place. It was Mr. Wilson's and his agents' knowledge that Mr. Love had the same or similar
14  claims stemming from the 1960's as Wilson that gave Wilson the incentive to keep Mr. Love out of
15  the Wilson investigation and subsequent litigation. Proof of the 1960's facts is proof of Wilson's
16  motives, and consequently, makes it more likely that the promises were made. Wilson's own
17  knowledge that the entire 1960's period was completely tainted with fraud gives him a motive to
18  keep Mr. Love in the dark as to those facts. Motive certainly tends to prove that certain
19  misrepresentations were made.

20       2.    **The 1960's Facts Are Relevant To Mr. Love's Justified Reliance.**

21       Whether a plaintiff reasonably relied on a promise is often a key issue in promissory
22  estoppel. Mr. Love's case is no exception. In fact, Wilson contends that Mr. Love's reliance on his
23  promises was <u>unreasonable</u>. The 1960's facts are necessary to show that Mr. Love's reliance on
24  Wilson's promises was reasonable. For example, if Wilson had not defrauded Mr. Love out of
25  millions in the 1960's, Mr. Love's reliance on Wilson's promises that he would pay him millions for
26  past royalties would likely be unreasonable. Conversely, if Mr. Love proves that Wilson owed him
27  millions from the 1960's, it would be reasonable to rely on the promise to pay that debt. Similarly,

28

TRIAL.BRF                                          - 24 -

1  if Mr. Love did not write the Sea of Tunes songs in the 1960's, it would likely be unreasonable to
2  rely on Wilson's promise to reclaim the copyrights for both of them or to correct the co-authorship
3  credits for the songs. Such a promise would make sense, however, if Mr. Love proves that he
4  actually co-authored the songs but was never given credit by Wilson.

5              3.    **The 1960's Facts Are Relevant To Damages.**

6      One of Wilson's promises was that he would pay Mr. Love what he was owed, or one third
7  of the case which ultimately became the Wilson Litigation. Obviously, the 1960's facts are required
8  to show (1) that Mr. Love co-wrote the songs, (2) why he was not credited as a co-author, and (3)
9  what the value of that co-authorship was worth. The 1960's facts go directly to the issue of the
10 amount of Mr. Love's damages.

11     Another promise was that Wilson would prospectively correct the co-authorship credits for
12 the Sea of Tunes songs to accurately reflect Mr. Love's contribution. Mr. Love must therefore show
13 what proper songwriter credit he should have received to show the proper measure of damages for
14 the breach of this promise as well.

15             4.    **The 1960's Facts Are Relevant To The Question Of Injustice In Not Enforcing**
16                   **The Promises.**

17     The 1960's facts concerning Wilson's and Murry's fraud on Mr. Love  conclusively show that
18 it would be manifestly unjust not to enforce Wilson's promises. The simple fact is that allowing
19 Wilson to get away with defrauding Mr. Love again is outrageous, particularly when Wilson admits
20 that he owes Mr. Love money. Injustice will result if the promise is not enforced because Love
21 forbore from intervening in the Wilson litigation and did not commence the current litigation until it
22 was clear that Wilson and his agents had no intention of keeping their promise. Additionally,
23 Wilson entered into a settlement agreement, the terms of which were designed to foreclose the
24 possibility of recovering the copyrights to the songs and defeat Love's rights in the songs. Without
25 enforcement of the promise, Love will have no way of recovering what he rightfully deserves.

26             5.    **The 1960's Facts Are Relevant to Mr. Love's Contract Claims.**

27     The same arguments above apply with equal force to Mr. Love's claims against Wilson for

28

TRIAL.BRF                                                    - 25 -

1  breach of contract.  Additionally, in determining whether there was a contract, and what the terms
2  of the contract were,  the 1960's facts show the circumstances and situations of the parties at the
3  time the promises were made.  See, Cal. Civil Code § 1647 (contract is "explained by reference to
4  the circumstances under which it was made and the matter to which it relates").

5       Where the terms of the promise are ambiguous or uncertain, as Wilson claims, evidence on
6  how Wilson believed that Mr. Love understood the promise is also relevant.  See Civil Code § 1649.
7  It is obvious that the 1960's facts relating to the coauthorship of the songs and the other events in
8  the 1960's materially affects how Mr. Love would understand the promises made.

9          6.     **The 1960's Facts Are Relevant to Mr. Love's Nineteenth Cause of Action**

10       Additionally, Love is entitled to present relevant evidence of Wilson's unjust enrichment.  In
11  order to show how Wilson was unjustly enriched at Love's expense, evidence of the what Love is
12  owed is obviously relevant.    Love intends to introduce evidence of  Wilson's $10 million dollar
13  enrichment, and the amount of money Mr. Love was owed from the 1960's and why is failure to
14  pay that amount from the settlement as promised constitutes an unjust enrichment.  Evidence
15  concerning why and how Wilson came to be enriched at Love's expense is also relevant.  For
16  example, Wilson's settlement with Irving Music, et. al. resulted from his conveying away
17  partnership assets, i.e. the songs coauthored by Love and Wilson during their songwriting
18  partnership.  Therefore, it is relevant for Love to introduce evidence that the songwriting partnership
19  existed, what the terms of the partnership agreement were and what the assets of the partnership
20  were.  This evidence tends to establish Love's entitlement to monies that Wilson unjustly received.

21          7.     **The 1960's Facts Are Relevant To The Eleventh Cause Of Action.**

22       The Eleventh Cause of Action is premised on numerous misrepresentations Wilson, James
23  Tierney, John Mason, Eugene Landy and James Little made to Mr. Love beginning in 1986.
24  Essentially, Wilson and his agents misrepresented that Wilson had no money to rectify his failure to
25  credit Mr. Love with co-authorship of the Sea of Tunes songs, but that he was investigating the
26  possibility of setting aside the 1969 Sale.  If he was successful, he would be able to use the proceeds
27  to rectify the fact that Wilson had been receiving millions of dollars in royalties that rightfully

28

TRIAL.BRF                                       - 26 -

1  belonged to Mr. Love. In addition, once he regained the copyrights, he would correct the fact the
2  Mr. Love was wrongfully excluded from ownership of the copyrights.[10]

3  Wilson acknowledges that Love's Eleventh Cause of Action is for fraud. *See* Motion in Limine of
4  Brian Wilson to Preclude Plaintiff From Using Evidence and Argument Concerning Adjudicated
5  Claims to Support the Eleventh Claim. [11]  He argues that evidence of the historical relationship
6  between the parties and the Beach Boys, the 1960's conduct of Murry Wilson, Abe Somer, Irving
7  Music, the songwriting partnership, and whether Love was defrauded in the 1960's out of copyrights
8  and royalties is irrelevant to this cause of action. *See* Motion in Limine of Brian Wilson to Preclude
9  Plaintiff From Using Evidence and Argument Concerning Adjudicated Claims to Support the
10 eleventh Claim, p. 4, II. 4 - 9.

11                    a.     *Relevancy To Whether The Misrepresentations Were Made.*

12      It should be apparent that Mr. Love's evidence showing that he was defrauded out of the
13 copyrights and royalties by Wilson and Murry in the 1960's, tends to make it more likely that
14 Wilson made the promises to pay Mr. Love in the 1980's. Otherwise, if Mr. Love had no claim to
15 either the royalties or the copyrights, Wilson's promise to rectify his past fraud would be unlikely,
16 since there would be no past debt to rectify. Similarly, evidence that Wilson owed Mr. Love
17 millions in royalties from the 1960's tends to show that it was more likely that Wilson made
18 promises to pay Mr. Love millions of dollars to correct that misappropriation in the 1980's. Wilson
19 denies that any promises were made. Thus, Mr. Love will necessarily be introducing evidence
20 concerning Murry Wilson, Sea of Tunes, the 1969 Sale, etc. to show the circumstances which tend
21 to prove that the misrepresentations were actually made.

22      In addition, Mr. Love contends that Wilson was his fiduciary and had an affirmative duty to

23

24 [10] For simplicity's sake and rather than recite the several representations repeatedly, and to show this motion's lack of merit, Plaintiff will refer to the promises as (1) to pay Mr. Love what was owed for past royalties, (2) to correct the copyright ownership prospectively, and (3) to pay Mr. Love
25 one third of the Wilson case started in 1986.

26 [11] " Since California law does not recognize a separate tort of civil conspiracy, the Eleventh Claim is simply for fraud. Doctors' Co. Ins. Serv. v. Superior Court, 225 Cal. App.3d 1284, 1289,
27 275 Cal.Rptr. 674 n.2 (1990)."   Motion in Limine of Brian Wilson to Preclude Plaintiff From Using Evidence and Argument Concerning Adjudicated Claims to Support the eleventh Claim, p. 5, n. 1.
28

TRIAL.BRF                                                - 27 -

1 disclose the material facts regarding his investigation. Thus, to establish this element of his claim,
2 Mr. Love must show that Wilson was Mr. Love' fiduciary. This issue alone requires introduction of
3 the 1960's facts. However, the 1960's facts must also be introduced to show the materiality of the
4 facts that Wilson failed to disclose. For example, Wilson's failure to disclose in 1986 that Abe
5 Somer represented both The Beach Boys and Irving Music in 1969 could not be introduced without
6 also showing why that fact was also "material," *i.e.*, that the fact would have tolled Mr. Love's
7 claims and enabled him to file suit in 1986.

8 Moreover, it is not enough simply to show that the representations were made – Mr. Love
9 must show that they were false. In order to show that the representations and omissions were false,
10 may of which concern the 1960's events, Mr. Love obviously must introduce evidence of the 1960's
11 facts to show that the representation were untrue. In addition, Mr. Wilson's own knowledge that
12 the entire 1960's period was completely tainted with fraud gives him a motive to keep Mr. Love in
13 the dark as to those facts. Motive certainly tends to prove that certain misrepresentations were
14 made.

15       b. *The 1960's Facts Are Relevant To Wilson's Knowledge Of The Falsity*
16           *Of His Representations.*

17 The 1960's facts are also germane to establishing Wilson's knowledge of the falsity of the
18 representations at the time they were made. For example, Landy, Mason and the Tierney firm, as
19 Wilson's agents, continually misrepresented to Love the nature of Wilson's suit. Little instructed
20 Love falsely as to the state of affairs in the 1960's when the fraudulent activities occurred. He failed
21 to disclose to Love the vital fact that Wilson gave Sea of Tunes to Murry Wilson via a handshake
22 agreement which was confirmed in the 1965 letter by Brian Wilson, and failed to disclose that the
23 1969 Letter was void, failed to disclose that the songwriter agreements were void, and that Somer
24 represented both The Beach Boys and Irving Music at the time of the 1969 Sale. Rather, they led
25 Love to believe that Murry Wilson simply sold the songs out from under Brian Wilson, who was
26 supposed to be holding the title for Love, and that Wilson was simply too drug-addicted to oppose
27 the sale. In essence, Wilson and his agents lied to Love to prevent him from discovering the true

28

TRIAL.BRF

- 28 -

1  state of affairs in the 1960's. To apprise Love of the reality would have disclosed to Love that he
2  had the exact same claims as did Wilson. These facts are vital and relevant for proving Love's
3  claim.

      c.    *The 1960's Facts Are Relevant To Mr. Love's Justified Reliance And His*
      *Damages.*

6  Whether a plaintiff reasonably relied on a misrepresentation is often a key issue in any fraud
7  case. Mr. Love's case is no exception. As stated above, the 1960's facts go directly to the question
8  of why Mr. Love's reliance was justified and to the measure and extent of Mr. Love's damages. *See*
9  §§ IV. (2), (3) *supra*.

10  8.    **Such Evidence, If Excluded, Is Highly Prejudicial to Mr. Love**

11  As discussed above, evidence of the 1960's facts is relevant to Mr. Love's remaining claims.
12  However, in addition, such evidence will not be time consuming to present and its exclusion will
13  seriously prejudice Mr. Love's case. Any balancing of harms, to the extent necessary, vastly weighs
14  in favor of admitting the evidence.

15  First, the evidence from the 1960's is neither extensive nor time-consuming. Wilson does
16  not even dispute Mr. Love's co-authorship of many of the songs, and has admitted to most of the
17  fraudulent 1960's acts. Mr. Love anticipates that introduction of such evidence will take very little
18  time. In large measure, these facts are admitted in Wilson's First Verified Complaint in the Wilson
19  Litigation. Second, the Court's exclusion of the evidence is so highly prejudicial that it constitutes
20  reversible error. Without such evidence, Mr. Love will be hard-pressed to demonstrate, among
21  other things, his justified reliance on Wilson's promises of several million dollars and a share of
22  valuable copyright interests. Obviously, preventing Mr. Love from putting on the evidence to
23  support his case is highly prejudicial.

24  B.    <u>Relevance Of Certain 1980's Facts.</u>

25  1.    **The Relevance Of Wilson's Verified First Amended Complaint.**

26  As Wilson himself admits, "Pleadings and testimony from a prior action can be admitted into
27  evidence as a statement by a party opponent under Federal Rule of Evidence 801(d)(2) . . ."

28

TRIAL.BRF

- 29 -

1 Wilson's Trial Brief, p. 32, lines 9-10. Wilson's Verified First Amended Complaint is relevant to the
2 remaining issues in the case. The complaint is both admissible and relevant for the following
3 reasons, among others.

4     The complaint serves to frame the issues from the Wilson Litigation in a short and succinct
5 manner without impinging on the attorney work product doctrine or the attorney-client privilege,
6 which will save time and testimony. It shows Wilson's position on how his portion of the
7 copyrights were lost, *i.e.*, Murry Wilson's fraud, and the invalidity of the 1969 Letter and the
8 songwriter agreements. It is relevant to show the circumstances under which the promises were
9 made to Mr. Love and his justifiable reliance. The complaint is also relevant to show what is owed
10 in connection with Wilson's promise "to pay Mr. Love what he owes." It is relevant to Mr. Love's
11 reliance because he knew that he had written songs with Wilson in the 1960's and was owed
12 money. It is an evidentiary admission of the validity of Mr. Love's claims (and the motives for the
13 December, 1986 letter), as well as Wilson's motivation to keep Mr. Love out of the case and to trick
14 and deceive him because of the similarity of their claims. As an evidentiary admission, the
15 complaint shows an additional motivation -- why Wilson and his attorneys could never have made
16 the arguments they are now using against Mr. Love had he participated in the Wilson Litigation. In
17 addition, the attorneys' verification of the complaint goes to show their implied authority to make
18 the promises on Wilson's behalf. Finally, the complaint is relevant to support Mr. Love's testimony
19 that Little told him the 1969 Letter was void because of Wilson's forged signature, and that Wilson's
20 promise to pay Mr. Love was not binding because it was not in writing.

21     Accordingly, for these reasons and more, the Verified First Amended Complaint is admissible
22 and relevant.

23          2.    **The Relevance Of The 1986 Fee Agreements And Billing Records.**

24     One of the issues in this case is when promises were made to Mr. Love, and what Wilson
25 and his attorneys knew and failed to disclose to Mr. Love. Aside from the obvious importance of
26 these documents to impeach the defense witnesses' credibility, since the documents directly
27 contradict several witnesses' sworn testimony, there are substantive reasons beyond impeachment
28

TRIAL.BRF

- 30 -

1 │ that Tierney's 1986 Fee Agreement and his 1986 billing records are relevant.

2 │     First, the documents show the beginning of Tierney's and Mason's agency relationship with
3 │ Wilson as being 1986, rather than 1989, as Tierney testified. The records also tend to show that the
4 │ promises were made to Mr. Love in 1986 around the time of the bills, and show that Wilson was
5 │ beginning to investigate the 1969 Sale in September 1986, as opposed to Mason's and Tierney's
6 │ false testimony. The existence of these billing records also tends to support Mr. Love's and Mr.
7 │ Kory's testimony that Wilson and his attorneys met with Mr. Love and Mr. Kory in 1986 and
8 │ promised to pay Mr. Love from the case. Moreover, the fact that Tierney and Mason were
9 │ investigating the 1969 Sale in 1986 tends to prove that Wilson did not disclose facts at that time that
10 │ he was obligated to disclose. *See* Civil Code § 1710. Thus, even though the records are admissible
11 │ for their impeachment value, they are demonstrably relevant.

12 │     3.     **The Relevance Of John Branca's Knowledge Of The Conflict Of Interest.**

13 │     John Branca was Brian Wilson's lawyer from 1978 through 1986, as well as trustee of the
14 │ Brian Wilson Trust from 1982 through 1986. In addition, he was the attorney for The Beach Boys.
15 │ In his dual capacity as attorney for Wilson and for The Beach Boys, Branca made promises to Mr.
16 │ Love during the 1986 meeting.[12]   Mr. Love will introduce evidence that Branca knew in 1985 or
17 │ before that Somer represented both parties in the 1969 Sale but failed to take any action. He also
18 │ failed to disclose the conflict, which would have given Mr. Love grounds to set aside the 1969 Sale
19 │ as well as Wilson. The timing of his knowledge therefore tends to show the motivations for keeping
20 │ Mr. Love "in the fold" on the Wilson case, but not close enough to participate. It shows Wilson's
21 │ knowledge of, and is evidence of, his representatives' lying to Mr. Love as early as 1986. Moreover,
22 │ it is evidence of Wilson's and his agents' agreement to keep the true facts about the 1969 Sale from
23 │ Mr. Love. Branca's knowledge also is evidence of concealment to prevent Wilson from paying Mr.
24 │ Love the royalties he wanted to pay in 1985. Finally, as the Court will be aware as the trial in this

25 │

26 │ [12] As one of the witnesses to promises made to Mr. Love, his credibility as a witness is
   │ always relevant. Mr. Love's evidence that Branca knew of the conflict in 1985 directly contradicts
   │ Branca's sworn testimony in the Wilson Litigation, and Mr. Love is entitled to bring this
27 │ contradiction before the jury so that it can properly weigh the value of Mr. Branca's testimony in
   │ this litigation.
28 │

1 matter progresses, Wilson's agents' manipulation of evidence and facts in the Wilson Litigation
2 tends to show that Mr. Love's testimony about the promises and the representations made to him at
3 his deposition in that case is accurate and truthful. Their manipulation of one of the key issues in
4 the Wilson Litigation will allow the jury to accurately gauge the credibility of Mr. Tierney and Mr.
5 Little in this case. Accordingly, evidence concerning the timing of Branca's knowledge is relevant
6 to the issues still remaining.

7     C.    <u>Wilson Cannot Use Depositions From The Wilson Litigation In This Action.</u>

8     Wilson intends to use a number of depositions taken in the Wilson Litigation to bolster his
9 defense in this case. However, because Mr. Love was not a party to the Wilson Litigation and
10 because he therefore had no notice of the depositions, they are inadmissible in this action.

11     Fed. R. Civ. P. 32(a) states:

12     At the trial . . . any part or all of a deposition . . . may be used against any party <u>who</u>
13     <u>was present or represented</u> at the taking of the deposition or who <u>had reasonable</u>
14     <u>notice</u> thereof . . . .

15 Because Mr. Love was neither a party nor present nor did he have notice, none of the depositions in
16 the Wilson Litigation are admissible in this litigation against Mr. Love (with the exception of his own
17 testimony in that litigation, which is suspect for other reasons). *Rodriguez v. Pacificare of Texas,*
18 *Inc.*, 980 F.2d 1014 (5th Cir.), *cert. denied*, 113 S.Ct. 2456 (1993). *See also, Hannah v. City of*
19 *Overland, Mo.*, 795 F.2d 1385 (8th Cir. 1986). Even if a witness in the prior case has died, if the
20 requisites of Fed. R. Civ. P. 32(a) are not met, the deposition is not admissible against the absent
21 party. *Acme Printing Ink Co. v. Menard, Inc.*, 812 F.Supp. 1498 (E.D.Wisc. 1992).

22     Therefore, the depositions from the Wilson Litigation cannot be used by Wilson to support
23 his defenses in this action.

24     D.    <u>Other Evidentiary Issues.</u>

25     Wilson has submitted numerous motions *in limine* in this action (including three served by
26 facsimile on Friday, May 13 at 4 p.m.). Mr. Love has opposed those motions, and respectfully
27 directs the Court to his Oppositions to those Motions. Other motions *in limine* which raise

28

TRIAL.BRF

1  evidentiary issues in this trial are:

2         1.    Motion *in Limine* to exclude all documents not produced by Wilson during

3               discovery;

4         2.    Motion *in Limine* to exclude reference to Mr. Love's settlement with other

5               defendants in this action;

6         3.    Motion *in Limine* to exclude reference to Wilson's alleged incompetence; and

7         4.    Plaintiff's *Ex Parte* Application for Contempt and Default Judgment and/or an

8               Order Precluding Wilson from Contradicting Mr. Love's Damages Evidence.

9

10                                            Respectfully submitted,

11                                            FLYNN, SHERIDAN & TABB

12

13  Dated: May 16, 1994                  By:   _____
                                                Philip H. Stillman, Esq.
14                                              Attorneys for Plaintiff

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TRIAL.BRF                                  - 33 -

## PROOF OF SERVICE

### STATE OF CALIFORNIA, COUNTY OF SAN DIEGO

I am employed in the County of San Diego, State of California. I am over the age of 18 and not a party to the within action; my business address is 6125 El Tordo, Rancho Santa Fe, California, 92067.

On May 16, 1994, I served the foregoing documents described as PLAINTIFF'S TRIAL BRIEF on the interested parties in this action by placing a true copy thereof enclosed in a sealed envelope at Rancho Santa Fe, California, addressed as follows:

Douglas Day, Esq.
Crowe & Day
100 Wilshire Blvd., Suite 200
Santa Monica, CA 90401

____ I placed such envelope with postage thereon fully prepaid to be placed in the United States Mail. I am readily available with the collection and processing of correspondence for mailing with the United States Postal Service. Correspondence for mailing is deposited with the United States Postal Service on that same day in the ordinary course of business. The foregoing document was sealed and placed for collection and mailing on the foregoing date, following the firm's ordinary practices. I am aware that on motion of any party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after the date of deposit for mailing in the affidavit. Executed on May 16, 1994, at Rancho Santa Fe, California.

__X__ I caused such envelope to be delivered by hand/fax to the offices of the addressee. Executed on May 16, 1994, at Rancho Santa Fe, California.

__X__ I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

PHILIP H. STILLMAN